WOODALL, Justice.
As he describes it, Ray Keith Wood pulled a muscle loose in his left forearm while working as a machinist for Black Creek, Inc., in February 2000. Black Creek’s workers’ compensation insurance carrier authorized surgery on Wood’s forearm. The surgery was performed on May 5, 2000. Wood returned to work on June 12, 2000, having been released by his surgeon to do only right-handed work; his left arm was in a brace.
During his first week back at work, Wood had three physical-therapy appointments. His time card indicated that he worked his full shift on June 12 before leaving for his appointment but that he left work an hour and a half early on June 15 and June 16 to go to physical therapy. Melanie Tullis, Black Creek’s human-resources manager, wrote up a disciplinary warning, citing Wood’s alleged failure to follow Black Creek’s policy that required employees to attempt to schedule their medical appointments at the beginning of, near the end of, or after their shifts. The disciplinary warning also warned that Wood was required to notify Tullis or his supervisor if he had to leave early to attend a medical appointment. This disciplinary warning was never given to Wood.
On June 19, 2000, Wood complained to his doctor that his light-duty job was causing pain in his right arm. The doctor gave Wood a written excuse for missing work on June 19, requesting in it that Black Creek “ease up” on the work being assigned to Wood. Tullis testified that Wood had told his supervisor that he would telephone her after his appointment on June 19 if he would not be returning to work that day. When Wood did not return to work or telephone his supervisor, Tullis wrote up a second disciplinary warning. This second warning, like the first, was never given to Wood.
On June 20, 2000, Wood arrived at work shortly before 7:00 a.m. for his scheduled shift. He testified that he was in a lot of pain and that the pain limited his use of both arms. Wood testified that he went to the front office and spoke to Daryl Weaver, Black Creek’s president. Wood said that he told Weaver that both his arms hurt and that he needed to see the doctor again. According to Wood, Weaver told him to “do what you gotta do” and to tell Tullis.
*168 Wood testified that, after speaking with Weaver, he approached Tullís, who told him that she did not have time to talk to him. Wood said that he told Tullís that he needed to go back to the doctor but that she told him that she did not have time to “fool with [him] right now.” Tullís testified that she had been conducting an orientation that morning for two new employees and had not had time to talk to Wood.
Both Wood and Tullís testified that Wood was agitated by Tullis’s response. Tullís testified that, as she walked away, she heard Wood say something. Two other Black Creek employees, DeLynn Min-shew and Byron Pledger, testified that they overheard Wood say: “She can just kiss my ass.” Wood admitted making the comment, but he testified that he “muttered [it] under his breath” after Tullís had walked away and that the remark was not directed at anyone. Minshew testified that Wood made the comment as he was “going out [of the office] into the shop” and as Tullís was walking down the hallway.
Wood testified that, after leaving the front office, he clocked out at 8:00 a.m. to go to the doctor.[1] George Robertson, a supervisor at the plant, testified that he heard Wood say: “I’m leaving, I am going home before I slap that bitch, if that workmen’s comp lady don’t have time to talk to me, I’m going to the house.” Wood denied saying that he would slap Tullís.
Tullís testified that, sometime during the morning of June 20, she learned of the statements Wood had allegedly made and she learned that Wood had left work early. She notified Tommy Marshall, the plant manager, that Wood had left early. Marshall testified that he asked Tullís and Wood’s supervisor whether Wood had received permission to leave work. Tullís testified that Wood had not asked her for permission to leave nor informed her that he needed to return to the doctor. Dorothy Willingham, Wood’s supervisor, also testified that Wood had not asked her for permission to leave work.
Marshall testified that he did not hear Wood make the allegedly inappropriate comments regarding Tullís but that he had received and reviewed written statements from Tullís, Minshew, Pledger, and Robertson. Marshall testified that Wood’s decision to leave work early on June 20 without permission and his comments regarding Tullís, considered together, formed the basis of Marshall’s decision to terminate Wood’s employment. On June 20, Marshall spoke to Wood by telephone and informed him that his employment with Black Creek had been terminated because he had left work early that day without permission.[2]
In August 2000, Wood sued Black Creek, seeking worker’s compensation benefits and alleging that Black Creek had discharged him in retaliation for his filing a worker’s compensation claim. See § 25-5-11.1, AIa.Code 1975 (“No employee shall *169 be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover worker’s compensation benefits .... ”). In February 2001, Wood’s worker’s compensation claim and retaliatory-discharge claim were severed, and the worker’s compensation claim was eventually settled. In December 2007 and January 2008, the trial court, sitting without a jury, heard testimony regarding Wood’s retaliatory-discharge claim.
At the close of Wood’s evidence, and again at the close of all the evidence, Black Creek filed what it styled as a motion to dismiss or, in the alternative, a motion for a judgment as a matter of law (“JML”).[3] The trial court denied the motions, and, on May 25, 2008, it entered a judgment in Wood’s favor, awarding him $50,000 in damages. The trial court later amended its judgment to specify that ‘Wood had proven a prima facie case of retaliatory discharge and that the stated reason for his discharge was pretextual and stating that Wood was awarded $20,000 in back wages and $30,000 for mental anguish.” Black Creek, Inc. v. Wood, 69 So.3d 156, 163 (Ala.Civ.App. 2010). Black Creek appealed to the Court of Civil Appeals.
On July 31, 2009, the Court of Civil Appeals issued a plurality opinion, in which the court reversed the trial court’s judgment. Wood applied for a rehearing. On March 12, 2010, the Court of Civil Appeals overruled Wood’s application for a rehearing but withdrew its original opinion and substituted a new one, also a plurality decision. In the new opinion, the Court of Civil Appeals reversed the decision of the trial court and remanded the case with instructions for the trial court to enter a judgment in Black Creek’s favor. Wood, 69 So.3d at 165-66.
Wood petitioned this Court for certiorari review of the Court of Civil Appeals’ judgment. He argued, pursuant to Rule 39(a)(1)(D), Ala. RApp. P., that the Court of Civil Appeals’ decision conflicts with prior caselaw from this Court. This Court granted certiorari review to address the alleged conflicts. We reverse and remand.

Analysis

In Alabama Power Co. v. Aldridge, 854 So.2d 554, 563 (Ala.2002), this Court stated:
“In order for an employee to establish a prima facie case of retaliatory discharge the employee must show: 1) an employment relationship, 2) an on-the-job injury, 3) knowledge on the part of the employer of the on-the-job injury, and 4) subsequent termination of employment based solely upon the employee’s on-the-job injury and the filing of a workers’ compensation claim.”
Once a plaintiff establishes a prima facie case of retaliatory discharge, “ ‘[t]he burden ... then shift[s] to the defendant employer to come forward with evidence that the employee was terminated for a legitimate reason, whereupon the employee must prove that the reason given by the employer was not true but a pretext for an otherwise impermissible termination.’ ” Culbreth v. Woodham Plumbing Co., 599 So.2d 1120, 1122 (Ala.1992) (quoting Twilley v. Daubert Coated Prods., Inc., 536 So.2d 1364, 1369 (Ala.1988)).
*170 “An employer’s stated basis for a discharge is sufficient as a matter of law when the underlying facts surrounding the stated basis for the discharge are undisputed and there is no substantial evidence indicating (a) that the stated basis has been applied in a discriminatory manner to employees who have filed workers’ compensation claims, (b) that the stated basis conflicts with express company policy on grounds for discharge, or (c) that the employer has disavowed the stated reason or has otherwise acknowledged its pretextual status.”
Aldridge, 854 So.2d at 568.
Black Creek has argued that Wood’s employment was terminated because (1) he voluntarily quit on June 20 by leaving work early without permission, and (2) his statements regarding Tullís — that he would “slap that bitch” and that “[s]he can kiss my ass” — violated company policies against the use of inappropriate language and threatening or insubordinate behavior.[4] In the opinion below, a plurality of the Court of Civil Appeals stated:
“Black Creek points out that, even though Wood’s alleged statement regarding slapping Tullís and his allegedly leaving work without permission were sharply disputed below, one other part of Wood’s behavior on June 20, 2000, which also formed part of the basis for Wood’s discharge, was undisputed. Specifically, Black Creek relies on Wood’s admission that he made the statement ‘she can just kiss my ass’ in reference to Tullís after she was unable to speak with him on June 20, 2000. Although Wood argued that the fact that he ‘mumbled’ the comment and did not make it directly to Tullís somehow ameliorated it, Wood admitted that, under the company handbook, the use of foul language was grounds for disciplinary action up to and including discharge. Thus, Black Creek is correct that one set of facts surrounding the stated basis for the discharge is undisputed.”
Wood, 69 So.3d at 164. Thus, the opinion “conclude[d] that Black Creek ha[d] presented undisputed evidence of a legitimate reason for Wood’s discharge — -that he used foul and inappropriate language in reference to a supervisory or managerial employee.” 69 So.3d at 165. The opinion reasoned that “[bjecause Black Creek’s advanced reason is legitimate, Wood failed to present substantial evidence indicating that he was discharged solely for filing a workers’ compensation claim, as he was required to do to recover under Ala. Code 1975, § 25-5-11.1.” 69 So.3d at 165.
Wood has admitted that he made the remark that Tullís could “kiss [his] ass.” For the purposes of our analysis in this case, we will assume that such language is “inappropriate to the workplace” as that phrase is used in Black Creek’s employee handbook and, thus, can provide “evidence that [Wood] was terminated for a legitimate reason.” Culbreth, 599 So.2d at 1122. We must now consider whether *171 Wood has demonstrated “that the reason given by [Black Creek] was not true” but, instead, was “a pretext for an otherwise impermissible termination.” Id.
In this regard, Wood argued in his petition for certiorari review that the Court of Civil Appeals’ decision conflicts with Cul-breth. In Culbreth, Ivy Culbreth filed a worker’s compensation claim after suffering an on-the-job injury that kept him away from work for approximately two weeks. Culbreth testified:
“ ‘I returned to work on November 14, 1989. I carried the doctor’s slip to John Woodham and reported back to work. He said he would have to wait for James Wade to get there. When Mr. Wade got there they went into a private office without me and stayed ten or fifteen minutes. When he returned he told me I did not have a job, that he did not have any work for me and that he had hired three men to replace me and do my job while I was out.’ ”
Culbreth, 599 So.2d at 1122.
This Court concluded that “a jury question is presented as to whether Woodham Plumbing’s asserted reason [was] a legitimate one or only a pretext.” Culbreth, 599 So.2d at 1123. We stated:
“John Woodham’s failure to immediately give [the allegedly legitimate] reason to Culbreth, together with the ‘ten or fifteen minute’ private conference with James Wade, whose position with Wood-ham Plumbing is not disclosed in the record, is sufficient circumstantial evidence from which a jury might be allowed to infer that Woodham Plumbing fabricated the asserted reason.”

Id.

Wood testified that, when Marshall telephoned him on June 20 to inform him that his employment had been terminated, Marshall stated that the reason for his termination was that Wood had left work early that day without permission. According to Wood, no mention was made of any allegedly inappropriate comment Wood made regarding Tullis.
Tullis testified repeatedly that Wood was not terminated or discharged for the use of foul or inappropriate language or for any other reason.[5] Instead, she insisted that he had voluntarily quit by leaving work early without permission. Tullis stated that, if Wood had not left early on June 20, he would have been discharged based on his allegedly inappropriate comments but that, because he did leave early, Wood’s decision to quit voluntarily was “the sole and only basis for his not working [at Black Creek] after June 20.”
Moreover, Marshall testified that, in deciding whether to terminate Wood’s employment, he reviewed the statements of the other Black Creek employees regarding Wood’s allegedly inappropriate com *172 ments. However, there was a factual issue as to when, in the course of the relevant events, the statements Marshall reviewed were prepared. Minshew testified that the statements were prepared around lunchtime. On the other hand, Wood testified that Marshall telephoned him to tell him that his employment had been terminated on the morning of June 20 and that during the telephone conversation Marshall did not mention any of Wood’s comments regarding Tullís. The trial court could have inferred from this testimony that Black Creek did not rely on any of Wood’s allegedly inappropriate comments in making its decision to terminate Wood’s employment but, instead, relied on them “after the fact to bolster its [allegedly] pretextual reason,” i.e., that Wood voluntarily quit by leaving work early on June 20 without permission. Flint Constr. Co. v. Hall, 904 So.2d 286, 251 (Ala.2004). In light of the disputed facts concerning the reasons for terminating Wood’s employment,
“[w]e cannot say as a matter of law that the [trial court] could not have concluded that [Black Creek’s] stated reason for [terminating Wood’s employment] was pretextual without impermissibly reweighing the evidence.
Flint Constr. Co., 904 So.2d at 252.
The decision of the Court of Civil Appeals conflicts with prior caselaw, and its judgment is due to be reversed. However, as Black Creek points out, if the Court of Civil Appeals’ decision is reversed, “there are several issues regarding the calculation of damages and award of mental anguish which [were] pretermitted by the Court of Civil Appeals which are due to be considered.” Black Creek’s brief, at 46. Therefore, we must remand the case to the Court of Civil Appeals for consideration of those issues.

Conclusion

The Court of Civil Appeals erred in reversing the trial court’s judgment and instructing the trial court to enter a judgment in Black Creek’s favor. Therefore, we reverse the Court of Civil Appeals’ judgment and remand the case to that court for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
COBB, C.J., and LYONS, STUART, SMITH, BOLIN, PARKER, MURDOCK, and SHAW, JJ., concur.

. Wood testified that he went to the doctor's office and waited for about an hour before being told that the doctor could not see him that day. Black Creek argued that the doctor’s office had no record of Wood's coming in or trying to make an appointment on June 20.

. It is not clear from the record when this telephone conversation took place. Wood said that he spoke to Marshall on the morning of June 20, after Woods left the doctor's office. Marshall testified that he reviewed the statements regarding Wood’s comments about Tullís before making his decision to terminate Wood's employment, and Minshew testified that the statements were prepared around lunchtime on June 20.

. In an action tried upon the facts without a jury, such a motion is properly characterized as a motion for a judgment on partial findings by the trial court. See Rule 52(c), Ala. R. Civ. P. Ordinarily, the standard of review applicable to rulings on such a motion is the ore terms standard. Burkes Mech., Inc. v. Ft. James-Pennington, Inc., 908 So.2d 905, 910 (Ala.2004).

. More specifically, Black Creek has argued that Wood’s statements violated the following provisions of its employee handbook:
"Failure to observe established rales and practices can lead to disciplinary action including formal warnings, suspension, probation, and discharge. The following is a noninclusive list of misconduct that may lead to immediate adverse personnel action.
[[Image here]]
"3. Language or actions which are inappropriate to the workplace....
[[Image here]]
"5. Threatening, assaulting, or abusing any employee, customer, or company visitor.
[[Image here]]
"14. Insubordination, including refusal to follow work directions.”

. The plurality opinion of the Court of Civil Appeals discounts Tullis’s testimony regarding the reason for the termination of Wood's employment on the basis that Marshall, not Tullis, was the ultimate decision maker regarding Wood’s employment. However, this fact, by itself, does not negate the relevance of her testimony regarding the reason that Wood’s employment was terminated. Black Creek does not argue that Tullis’s testimony was inadmissible or cite any authority indicating that the trial court could not consider her testimony in determining whether Black Creek’s proffered reasons for terminating Wood's employment were pretextual. Moreover, there is evidence indicating that Tullis was involved in the decision-making process. The record indicates that Tullis informed Marshall that Wood had left work early on June 20 without permission, that she had written on Wood’s time card for that day that he had voluntarily quit, and that she was in Marshall’s office when Marshall telephoned Wood to tell him that his employment had been terminated.